IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


LINDA LOU DAWSON, individually and
in her Capacity as Executor of the
Estate of Ronald Wade, Deceased,

        Plaintiff,

v.                   //   CIVIL ACTION NO. 1:11CV114
                              (Judge Keeley)


UNITED STATES  OF AMERICA,

        Defendant.


## MEMORANDUM ORDER AND OPINION DENYING THE REMAINDER OF THE PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 46]

Before the Court is that part of the motion for partial summary judgment filed by the plaintiff, Linda Lou Dawson ("Dawson"), not yet addressed by the Court. (Dkt. No. 46). For the reasons that follow, the Court **DENIES** the remainder of the motion.

**I.**

The Court's previous Memorandum Order and Opinion reviewed in detail the procedural and factual history of this litigation involving Ronald Wade ("Wade"), a veteran who was a patient at Louis A. Johnson Veterans Administration Medical Center in Clarksburg, West Virginia (the "Clarksburg VA"), and West Virginia University Hospitals, Inc. ("WVUH"). What follows, therefore, is a

## ORDER DENYING THE REMAINDER OF THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 46]

brief summary of the case relevant to the questions that remain.[1] See (Dkt. No. 55).

Dawson is the surviving daughter of Wade, who underwent surgery for bladder cancer at the Clarksburg VA in 2007. Wade later died of COPD in 2009, while a resident in the extended care facility at the Clarksburg VA. Almost two years after Wade's death, on July 27, 2011, Dawson, as the executor of Wade's estate, sued the Government pursuant to the FTCA, 28 U.S.C. § 2671 et seq., alleging injuries stemming from several instances of medical negligence by Wade's attending urologist, Douglas McKinney, MD ("McKinney").

Relevant to the pending motion, Dawson first argues that, as a matter of law, West Virginia's Medical Professional Liability Act (the "MPLA"), W. Va. Code §§ 55-7B-1 – 12, permits a single plaintiff to recover for multiple occurrences of medical malpractice. In addition, she contends that no genuine issues of material fact remain regarding whether Wade was the victim of two occurrences of medical negligence at the hands of McKinney, as a consequence of which he lost two "bodily organ systems." Pursuant

---

[1]    See the Court's Memorandum Opinion and Order of June 14, 2013 (dkt. no. 55) for a fuller recitation of the factual history and procedural background of the case.

2

to § 55-7B-8(b), Dawson asserts that Wade's estate is entitled to recover up to $1,000,000 for at least two instances of medical negligence resulting in the loss of two bodily organ systems.[2] See id. § 55-7B-8(b).

The United States disputes these contentions. It argues that, as a matter of law, the MPLA does not support multiple awards for multiple occurrences of malpractice. Even if it did, the government asserts that McKinney's treatment did not fall below the applicable standard of care. Consequently, Wade could not have suffered the loss of any bodily organ system as a proximate result of one or more negligent acts by McKinney. Dawson disputes these contentions, arguing that, if Wade did not lose two bodily organ systems, he nevertheless suffered two "permanent and substantial deformit[ies]," as a result of McKinney's negligence – i.e. the installation of two ostomies with collection bags and the attendant scarring – and thus is entitled to recover up to $500,000 for each occurrence under the MPLA.

_____

[2]    W. Va. Code § 55-7B-8(c) provides for the caps on compensatory, non-economic damages found in § 55-7B-8(a), (b) to be increased each year beginning on January 1, 2004, by an amount equal to the consumer price index published by the United States Department of Labor. According to Dawson, the cap in subsection (b) increased to $610,610.00 in 2013 (or $1,221,220 in the case of two occurrences). For simplicity of discussion, however, the statutory amounts of $250,000 ($500,000 for two occurrences) and $500,000 ($1,000,000 for two occurrences) will be referenced in this opinion.

**ORDER DENYING THE REMAINDER OF THE PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 46]**

## II.

On a motion for summary judgment the Court reviews all evidence in the light most favorable to the Government, which is the nonmoving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c)(1)(A), (a). When ruling on a motion for summary judgment, the Court reviews all the evidence "in the light most favorable" to the nonmoving party. Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has made the

necessary showing, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256 (internal quotation marks and citation omitted). The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment; the evidence must be such that a rational trier of fact could reasonably find for the nonmoving party. Id. at 248–52.

### III.

As a general proposition, the MPLA limits a plaintiff's recovery for noneconomic losses in a professional liability action against a health care provider. West Virginia Code § 55-7B-8(a) states:

> In any professional liability action brought against a health care provider pursuant to this article, the maximum amount recoverable as compensatory damages for noneconomic loss shall not exceed two hundred fifty thousand dollars per occurrence, regardless of the number of plaintiffs or the number of defendants or, in the case of wrongful death, regardless of the number of distributees, except as provided in subsection (b) of this section.

Thus, § 55-7B-8(a) limits a plaintiff's recovery for noneconomic damages from a negligent health care provider to $250,000 per occurrence, regardless of the number of plaintiffs or defendants.

This cap, however, is subject to the following exception found in subparagraph (b):

## ORDER DENYING THE REMAINDER OF THE PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT [DKT. NO. 46]

> The plaintiff may recover compensatory damages for
> noneconomic loss in excess of the limitation described in
> subsection (a) of this section, but not in excess of five
> hundred thousand dollars for each occurrence, regardless
> of the number of plaintiffs or the number of defendants
> or, in the case of wrongful death, regardless of the
> number of distributees, where the damages for noneconomic
> losses suffered by the plaintiff were for: (1) Wrongful
> death; (2) permanent and substantial physical deformity,
> loss of use of a limb or loss of a bodily organ system;
> or (3) permanent physical or mental functional injury
> that permanently prevents the injured person from being
> able to independently care for himself or herself and
> perform life sustaining activities.

§ 55-7B-8(b). Pursuant to subparagraph (b), whenever a plaintiff

suffers certain severe injuries due to the negligence of a health

care provider, she is no longer limited to the $250,000 cap in

subparagraph (a), but may instead recover up to $500,000 for each

occurrence.

**IV.**

Dawson's motion for partial summary judgment poses three novel

legal questions relating to the MPLA. First, W. Va. Code § 55-7B-8

allow a single plaintiff to recover multiple awards of

compensatory, non-economic damages due to multiple occurrences of

negligence by a health care provider? Second, what is the

definition of "occurrence," a term used three times in § 55-7B-8,

which the West Virginia Legislature (the "Legislature") failed to

define? Third, what does the term "bodily organ system," found in

**ORDER DENYING THE REMAINDER OF THE PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 46]**

§ 55-7B-8(b) but also undefined, mean? The Court will address those issues in turn.

**A.**

Where a statutory provision is "'clear and unambiguous and plainly expresses the legislative intent,'" the court will enforce its plain meaning without resort to interpretation. <u>Grubb v. Jos. A. Bank Clothiers, Inc.</u>, No. Civ.A. 2:05-0056, 2005 WL 1378721, at *6 (S.D.W. Va. Feb. 28, 2011) (quoting <u>Daily Gazette Company, Inc.</u>, 521 S.E.2d 543, 551 (W. Va. 1999) (quoting Syl. Pt. 1, <u>State v. Epperly</u>, 65 S.E.2d 488 (W. Va. 1951))). "Absent a statutory definition of [contested] terms, [a court] will necessarily defer to the 'common, ordinary, and accepted meanings of the terms in the connection in which they are used.'" <u>State v. Edmonds</u>, 702 S.E.2d 408, 413 (W. Va. 2010) (citing <u>In re Clifford K.</u>, 619 S.E.2d 138, 153 (W.Va. 2005)); <u>see also</u> Syl. pt. 1, <u>Miners in Gen. Group v. Hix</u>, 17 S.E.2d 810 (W. Va. 1941), <u>overruled on other grounds by Lee-Norse Co. v. Rutledge</u>, 291 S.E.2d 477 (W. Va. 1982). Finally, when a court reads a statute it should do so in such a way that avoids rendering any words of the statute surplusage. "It is presumed the legislature had a purpose in the use of every word, phrase and clause found in a statute and intended the terms so used to be effective . . . ." <u>Osborne v. United States</u>, 567 S.E.2d 677,

673 (W. Va. 2002) (quoting Syl. pt. 7, <u>Ex parte Watson</u>, 95 S.E. 648 (W. Va. 1918)).

**B.**

The government contends that the MPLA does not countenance multiple recoveries by a single plaintiff for more than one occurrence of negligence by a health care provider. <u>See</u> (Dkt. No. 47 at 18). The plain language of the MPLA, however, as well as foundational principles of statutory interpretation, belie that interpretation.

W. Va. Code § 55-7B-8(a) limits any recovery of compensatory damages for non-economic loss to "two hundred fifty thousand dollars **per** occurrence." Likewise, subparagraph (b) of that section caps recovery of compensatory damages for non-economic loss in the case of certain, severe injuries at "five hundred thousand dollars **for each** occurrence." Presumably, the Legislature purposefully included the words "per" and "for each" in subparagraphs (a) and (b), and intended those terms to be effective. <u>See</u> <u>Osborne</u>, 567 S.E.2d at 673.

<u>Webster's Third New International Dictionary</u> defines "per" as "with respect to each member of a specified group or series: for each." <u>Webster's Third New Int'l Dictionary</u> 1674 (2002) ("<u>Webster's</u>"). Likewise, <u>Black's Law Dictionary</u> ("<u>Black's</u>"),

defines that term as "for each; for every." Black's 1250 (9th ed. 2009). Webster's defines "each" as "being one of two or more distinct individuals having a similar relation and often constituting an aggregate." Webster's 713 (2002); see Rattler Tools, Inc. v. Bilco Tools, Inc., No. 05-293, 05-3777, 2007 WL 2008504, at *10 (E.D.La. July 6, 2007) (concluding that, in the context of a particular patent, the phrase "for each" indicated a "one-to-one correspondence"). Based on those definitions, the Court concludes that "per" and "for each" are synonyms.

When, as here, the Legislature saw no need to define terms such as "per" and "for each," a court should apply those terms according to their ordinary and accepted meanings. Edmonds, 702 S.E.2d at 413. As observed by the Eastern District of Louisiana in Rattler Tools, Inc., 2007 WL 2008504 at * 10, the common understanding of "for each" is a "one-to-one correspondence." In the context of W. Va. Code § 55-7B-8(a) and (b), "for each", and its synonym, "per", clearly indicate a one-to-one correspondence between an award for non-economic, compensatory damages (each subject to its own statutory cap), and an occurrence of medical negligence. Inductively, two occurrences of medical negligence should correspond to two awards for non-economic, compensatory damages (again, each subject to its own statutory cap).

ORDER DENYING THE REMAINDER OF THE PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 46]

This conclusion aligns with the oft-cited rule, applicable to the MPLA, that "[s]tatutes in derogation of the common law are strictly construed." Phillips v. Larry's Drive-In Pharmacy, Inc., 647 S.E.2d 920, 928 (W. Va. 2007) (the Legislature passed the MPLA in derogation of the common law). "Where there is any doubt about their meaning or intent they are given the effect which makes the least rather than the most change in the common law." Id. (quoting Norman J. Singer, 3 Sutherland Statutory Construction § 61:1 at 217 (6th Ed. 2001)). At common law, a plaintiff's recovery is premised on her ability to "prove that the defendant [is] guilty of primary negligence and that such negligence [is] the proximate cause of the injury of which the plaintiff complains." Matthews v. Cumberland & Allegheny Gas Co., 77 S.E.2d 180, 188 (W. Va. 1953). To adopt the government's position would drastically depart from that rule, because a plaintiff such as Dawson would be limited to a single recovery no matter how many negligent acts proximately caused injury to Wade.

**C.**

The Legislature also failed to define the term "occurrence" as it appears in W. Va. Code § 55-7B-8. Neither party argues the term is ambiguous, however; thus, the common meaning of the term controls the Court's analysis. Edmonds, 702 S.E.2d at 413. In the

10

legal context, "occurrence" is commonly understood to mean
"[s]omething that happens or takes place; specif., an accident,
event, or continuing condition that results in personal injury or
property damage that is neither expected nor intended from the
standpoint of an insured party." Black's 1185 (9th ed. 2009).

On facts analogous to those presented in Dawson's motion, the
Court of Appeals of Indiana (the "Indiana court"), in Medical
Assurance of Indiana v. McCarty, 808 N.E.2d 737 (Ind. Ct. App.
2004), adopted a definition of "occurrence" very similar to that in
Black's.[3] For purposes of Indiana's medical malpractice reform
statute, the Indiana court defined "occurrence of malpractice" as
"the negligent act itself plus the resulting injury, with a health
care provider's liability limited to the lowest common denominator
between act and injury." McCarty, 808 N.E.2d at 745.

Decisions of the Supreme Court of Appeals of West Virginia
(the "Supreme Court of Appeals") relied on by the parties support
the adoption of the Indiana court's definition of "occurrence" for
purposes of W. Va. Code § 55-7B-8. For example, in Shamblin v.

---

[3]    Like West Virginia, Indiana has capped damages recoverable
from qualified health care providers at $250,000 per occurrence. Compare
Ind. Code. § 34-18-14-3 ("A health care provider qualified under this
article . . . is not liable for an amount in excess of two hundred fifty
thousand dollars ($250,000) for an occurrence of malpractice.") with W.
Va. Code § 55-7B-8(a). Also as in West Virginia, the Indiana legislature
failed to define "occurrence."

Nationwide Mutual Ins. Co., 332 S.E.2d 639, 644 (W. Va. 1985), the
Supreme Court of Appeals reasoned that where two negligent acts
occurred simultaneously to produce the same collision only one
occurrence – the collision – had taken place for insurance coverage
purposes. Likewise, in Helmick v. Jones, 452 S.E.2d 408, 411 (W.
Va. 1994), another coverage case, the negligence of a "covered
auto" and an "other than covered auto" that had caused a single
accident gave rise to only one occurrence for policy purposes.
Finally, in Auber v. Jellen, 469 S.E.2d 104 (W. Va. 1996), where
the defendant repeatedly failed to diagnose the plaintiff's colon
cancer, the Supreme Court of Appeals treated the successive
examinations as if they had "result[ed] in one injury" for the
purpose of the defendant's claims-made policy. Id. at 108. The
court in Auber concluded that, because the policy treated "all
injury resulting from a series of acts or omissions in providing
medical services to one person," the plaintiff presented only one
compensable incident. Id. at 108-09.

The definition of "occurrence" adopted by the Indiana court in
McCarty employs the logic followed in these West Virginia insurance
cases. Rather than focus on the collision, as the Supreme Court of
Appeals did in Shamblin and Helmick, the court in McCarty looked to
the personal injury resulting from the defendant's alleged

negligence. <u>McCarty</u>, 808 N.E.2d at 745. That shift is appropriate here in light of the fact that the term "occurrence" is used in W. Va. Code § 5507B-8 in reference to the damages available to medical malpractice plaintiff, who must successfully show that a health care provider failed to meet the applicable standard of care and that such failure "was the proximate cause of the injury or death". <u>See</u> W. Va. Code 55-7B-3.

Moreover, when the Indiana court's definition of occurrence in <u>McCarty</u> is applied to the facts in <u>Shamblin</u>, <u>Helmick</u>, and <u>Auber</u> the conclusion is the same: where multiple acts of negligence produce the same result, only one compensable occurrence arises. Conversely,"if there is only one [negligent] act but two injuries, there can only be one 'occurrence' and health care provider payment." <u>McCarty</u>, 808 N.E.2d at 745-46.

For those reasons, the Court adopts the definition of "occurrence" in <u>McCarty</u>, but with one addition. W. Va. Code § 55-7B-3 requires that a plaintiff in a medical negligence case prove that the health care provider's failure to adhere to the applicable standard of care was "a proximate cause of the injury or death." Thus, any definition of "occurrence" must reflect the element of proximate cause in order to comport with the legislative intent expressed in § 55-7B-3, a well as traditional elements of

13

negligence. See Marcus v. Staubs, 736 S.E.2d 360, 371 (W. Va. 2012)("To be actionable, negligence must be the proximate cause of the injury complained of and must be such as might have been reasonably expected to produce an injury.") (quoting Syl. Pt. 3, Hartley v. Crede, 82 S.E.2d 672 (1954)). Accordingly, the Court defines "occurrence" for the purposes of W. Va. Code § 55-7B-8 as "the negligent act itself plus the injury that proximately results, with a health care provider's liability limited to the lowest common denominator between act and injury."

Forshey v. Jackson, on which the Government relies, is inapposite. Forshey, 671 S.E.2d 748, 758 (examining the continuing tort doctrine in the context of a medical malpractice action). West Virginia recognizes a distinction "between the continuing tort theory for purposes of a statute of limitations analysis and a 'series of acts' under an insurance policy for purposes of coverage." Beckley Mech., Inc. v. Erie Ins. & Cas. Co., 374 Fed. App'x 381, 384 (4th Cir. 2010) (citing Auber, 469 S.E.2d at 108). In other words, whether a series of acts constitute a continuing tort for the purpose of tolling the statute of limitations, and whether that same series presents one or multiple occurrences for insurance coverage purposes, are separate inquiries. See Beckley Mech., Inc., 374 Fed. App'x. at 384; Auber, 469 S.E.2d at 108.

Moreover, there is no ambiguity in the Legislature's use of the term "occurrence" that would "tie[] the interpretation of [that term] to whether such series of acts would constitute a continuing tort." See Beckley Mech., Inc., 374 Fed. App'x. at 384. To the extent that the interpretation of a policy term and the interpretation of a term in a statute are similar inquiries, the Court concludes that, because "occurrence" is unambiguous as it appears in W. Va. Code § 55-7B-8, there is no need to look to the continuing tort doctrine.

Chastain v. Anmed Health Foundation, 694 S.E.2d 541 (S.C. 2010), another case relied upon by the government, is equally inapplicable. Chastain addressed the proper application of the definition of "occurrence" enacted by the South Carolina Legislature as part of the South Carolina Tort Claims Act. Id. at 173 (citing S.C. Code Ann. §§ 15-78-30(g), 15-78-120(a)(1), (a)(3)). That Act, however, addresses the immunity of the State of South Carolina and its political subdivisions to tort claims. See id. § 15-78-20. It is not a medical malpractice reform statute, compare id. §§ 15-79-110 – 130 (Medical Malpractice Actions), and therefore provides no apt comparison here.

ORDER DENYING THE REMAINDER OF THE PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 46]

**D.**

Finally, the Court must define "bodily organ system." Here, again, although the Legislature failed to define this term, it is not ambiguous and the Court therefore may simply apply the "'common, ordinary, and accepted meanings of the terms.'" Edmonds, 702 S.E.2d at 413.

The Court looks to Stedman's Medical Dictionary (28th ed. 2006) ("Stedman's") for the common definitions of the "urinary system" and the "digestive system," the two "bodily organ systems" at issue in this case.[4] (Dkt. No. 46-1 at 22-23); see Williams v. Bausch & Lomb Co., No. 2:08-cv-910, 2010 WL 2521753 (S.D.Oh. June 22, 2010) (applying Stedman's definition of "organ" and "system" to define "bodily organ system" for the purposes of Ohio's medical malpractice reform statute). Based on those definitions, it concludes that, for purposes of this case, the "urinary system" includes "all organs concerned with the formation, storage, and voidance of urine including kidneys, ureters, bladder, and urethra." Stedman's 1928 (28th ed. 2006). As well, the "digestive system," also known as the "alimentary system," encompasses "the

---

[4]     The urinary and digestive systems are two "complex[es] of structures" that are "functionally related" and thus are "bodily organ systems." See Stedman's 1923 (28th ed. 2006).

**ORDER DENYING THE REMAINDER OF THE PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 46]**

digestive tract from the mouth to the anus with all its associated glands and organs." Id. at 1923.[5]

**V.**

Having defined the terms "occurrence" and the relevant "bodily organ systems" (the "urinary system" and the "digestive system"), the Court turns finally to whether Dawson has successfully met her burden on summary judgment of establishing that there are no genuine issues of material fact regarding her entitlement to two awards of compensatory damages for non-economic loss pursuant to W. Va. Code § 55-7B-8.

Dawson has not satisfied that burden. See Celotex Corp., 477 U.S. at 323 (moving party bears the initial burden of establishing the nonexistence of genuine issues of fact). As the Court has concluded, in order to prove two separate occurrences of medical

---

[5] In reply, Dawson argues that the Supreme Court of Appeals would not interpret "loss of a bodily organ system" to require permanent and total loss of the entire system. See (Dkt. No. 51 at 11) (citing MacDonald v. City Hosp., Inc., 715 S.E.2d 405, 423 (W. Va. 2011)). While Dawson correctly observes that, in MacDonald, the Supreme Court of Appeals left undisturbed the trial court's conclusion that the plaintiff had lost a "bodily organ system," i.e. his muscle system, because he had lost the use of his legs, the Supreme Court of Appeals did so reluctantly and on an extremely deferential standard of review. The court in fact stated that "[w]hile this Court might have reached a different conclusion based on the evidence and record before us, it is not the role of an appellate court to second-guess the finder of fact." For that reason, this Court does not find MacDonald persuasive, and intends to apply the common meaning of the terms "urinary system" and "digestive system" in this case.

**ORDER DENYING THE REMAINDER OF THE PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 46]**

negligence for purposes of the MPLA, Dawson must establish by a preponderance of the evidence that McKinney committed two distinct acts of negligence proximately causing two distinct injuries. See supra (definition of "occurrence" for the purpose of W. Va. Code § 55-7B-8).

Clearly, there are disputed issues of fact material to these issues. The parties dispute whether McKinney's decision to perform the cystoprostatectomy deviated from the applicable urological standard of care. Dawson maintains the surgery was medically unnecessary; the government contends the procedure saved Wade's life. The parties also dispute whether McKinney failed to follow Wade appropriately after the surgery. Dawson contends that McKinney abandoned his patient. The government asserts McKinney's post surgery follow up was within the applicable standard of care. Important questions of causation also remain concerning whether Wade's post-operative complications and resulting surgery at WVUH were proximately caused by 1) an allegedly unnecessary cystoprostatectomy, 2) McKinney's allegedly negligent failure to provide and monitor Wade's post-operative condition, or 3) were unfortunate post-operative complications for which McKinney bears no fault.

## ORDER DENYING THE REMAINDER OF THE PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT [DKT. NO. 46]

In addition, the parties dispute whether Wade's injuries merit application of the $500,000 cap on compensatory, non-economic damages found in W. Va. Code§ 55-7B-8(b). While Dawson maintains that Wade lost his urinary and digestive systems as a consequence of McKinney's alleged negligent acts, the government contends that, although Wade may have lost portions of those systems, he did not lose the entire function of those systems. (Dkt. No. 47 at 23). The government also alleges that Wade, a smoker, was comparatively at fault for his failure to fully recover following his surgery.

The applicability of W. Va. Code § 55-7B-8(b) also remains an issue for trial because, as Dawson also argues, the two ostomies constructed in Wade's abdominal wall – the first for the external collection of urine, the second for the collection of solid waste - caused "scarring" or some "permanent and substantial physical deformity" meriting application of the $500,000 cap in § 55-7B-8(b). Those issues certainly raise material questions of fact regarding liability and damages that will need to be resolved at trial. See Bransteter v. Moore, 3:09cv2, 2009 WL 152317, at *3 (N.D. Ohio Jan. 21, 2009) ("scarring **may** be so severe as to qualify as a serious disfigurement") (emphasis in original); Wilson v. United States, 375 F. Supp. 2d 467, 471 n.5 (E.D. Va. 2005) (applicability of the "permanent and substantial physical deformity

exception[] is a question to be determined at trial"). But see
Weldon v. Presly, 1:10cv1077, 2011 WL 37494469, at *7 (N.D.Oh. Aug.
9, 2011) (holding that, as a matter of law, a four (4) centimeter
scar was not a "permanent and substantial physical deformity").

**VI.**

In conclusion, for the reasons discussed, the Court **DENIES** the
remainder of Dawson's motion for partial summary judgment. (Dkt.
No. 46). This case remains on the Court's trial docket and is
scheduled as the first case on Monday, July 1, 2013.

It is so **ORDERED.**

The Court directs the Clerk of Court to transmit copies of
this Order to counsel of record.

DATED: June 20, 2013.


/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE