IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

LINDA LOU DAWSON, individually and
in her Capacity as Executrix of the
Estate of Ronald Wade, Deceased,

        Plaintiff,

v.                  //   CIVIL ACTION NO. 1:11CV114
                             (Judge Keeley)

UNITED STATES OF AMERICA,

        Defendant.

## MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW AND GRANTING JUDGMENT TO PLAINTIFF

Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. (the "FTCA"), the Court held a bench trial on July 2-3, 2013, to determine whether the plaintiff, Linda Lou Dawson ("Dawson"), could establish by a preponderance of the evidence that the defendant, the United States of America (the "United States" or the "government"), through the negligence of its employees at the Lewis A. Johnson VA Medical Center in Clarksburg, West Virginia (the "Clarksburg VA"), was liable in tort for injuries her father, Ronald K. Wade ("Wade"), suffered prior to his death. Based on the findings of fact and conclusions of law that follow,[1] the Court **GRANTS** judgment to Dawson in the amount of **$635,641.30**.

---

[1] "In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52.

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

**I. INTRODUCTION**

**A. Procedural Background**

On July 27, 2011, Dawson filed a complaint in this Court, alleging medical negligence (Count I), negligence (Count II), and wrongful death (Count III) against the United States, pursuant to the FTCA. Her claims involved an allegedly unnecessary cystoprostactectomy with ileal conduit and post-operative abandonment by Wade's attending urologist, Dr. Douglas McKinney ("Dr. McKinney"). On May 29, 2012, the parties stipulated to the dismissal of Count II (dkt. no. 24), and, on April 29, 2013, Dawson withdrew Count III (dkt. no. 51).

On April 8, 2013, Dawson filed a motion for partial summary judgment, in which she contended that she was entitled to monetary damages for non-economic losses suffered by Wade, and that, under the West Virginia Medical Professional Liability Act, W. Va. Code § 55-7B-1, et seq. (the "MPLA"), those damages were neither limited by the exclusion of punitive damages under 28 U.S.C. § 2674, nor subject to the lower $250,000 cap on non-economic damages under the MPLA.

The Court granted the motion in part and denied it in part, (dkt. no. 55), holding that the FTCA did not preclude Dawson from

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

recovering compensatory (but not punitive) damages for Wade's pre-death pain and suffering. It also provided definitions of "occurrence," "urinary system," and "digestive system" for purposes of the MPLA. Finally, it held that Dawson had not satisfied her burden on summary judgment of establishing that no question of fact existed as to either separate occurrences or entitlement to the enhanced cap on statutory damages under § 55-7B-8(b).

The case then proceeded to trial, beginning July 2, 2013, and concluding the following day. Dawson testified on her own behalf, and called Dr. McKinney, Ashley Dawson (her daughter), and Drs. Stanley Zaslau (WVU urologist), Hannah Hazard (WVU general surgeon), and Ronald Hrebinko ("Dr. Hrebinko") (urology expert) as witnesses. The Government called Maryann Pancake ("Ms. Pancake"), Wade's social worker at the CLC, and Drs. Lora Westfall ("Dr. Westfall") (internist at the Clarksburg VA), Clyde Moxley ("Dr. Moxley"), Wade's treating physician prior to his death, and John Lyne ("Dr. Lyne") (urology expert) as witnesses. The evidence focused on questions regarding the following three elements of Dawson's medical negligence claim:

A.   Whether Dr. McKinney breached the applicable standard of
     care by (1) negligently recommending a radical

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**AND GRANTING JUDGMENT TO PLAINTIFF**

cystoprostactectomy with ileal conduit, and (2) abandoning Wade post-operatively;

B.      If Dr. McKinney did breach the applicable standard of care, whether one or both of the breaches alleged by Dawson proximately caused Wade to lose a bodily organ system or to suffer a permanent and substantial physical deformity; and

C.      If Wade did lose a bodily organ system or suffer a qualifying deformity, what non-economic damages resulted from that loss or deformity.

**B. Factual Background**[2]

Born in 1935, Wade spent several years in the military and then worked as a maintenance worker at West Virginia University ("WVU") until his retirement in 1995.  In 1996, he was united with Dawson, a daughter he had not known existed.  (Dkt. No. 80 at 14).  Over the next decade, Wade developed a close relationship with Dawson and her children.  Trial Tr. 25:12-14.

---

[2]  This subsection contains a general overview of the facts of the case in order to provide relevant context.  More specific factual findings are included within the analysis of each element of the medical negligence claim.

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

In 2005, Wade began treatment for bladder cancer at the Clarksburg VA under the care of Dr. Antonio Mataban ("Dr. Mataban").[3] When Dr. Mataban retired in February 2006, Dr. Douglas McKinney took over Wade's care. Id. at 80:8-12. After further treatment and testing, in August 2007, Dr. McKinney recommended that Wade undergo a surgical procedure known as a radical cystoprostatectomy with ileal conduit, which involves the removal of the bladder and the construction of a conduit through which urine is expelled. Id. at 82:16-24. The conduit is formed by removing a portion of the ileum, connecting one end to the ureters, protruding the other end through an ostomy in the abdominal wall, and forming the externalized portion into a stoma, an opening in the abdomen to allow for the excretion of bodily waste. The patient's urine is expelled through the stoma into a plastic bag. Id. at 84:9-20. Dr. McKinney performed the operation on Monday, October 1, 2007. Id. at 92:10-12.

Following the surgery, Wade's condition began to deteriorate on the first post-operative day. Dr. McKinney consulted with Dr. Lora Westfall, an internist, and Dr. Kashif Khan ("Dr. Khan"), a

---

[3] Having served two terms in the United States Navy between 1952 and 1957, Wade was entitled to VA medical services.

nephrologist, regarding Wade's clinical status. Id. at 97:16-19, 100:12-14. Wade's condition continued to deteriorate until, on Saturday, October 7, 2007, the sixth post-operative day, Dr. Khan determined that Wade was in danger of dying and arranged to transfer him to WVU Ruby Memorial Hospital ("Ruby") in Morgantown, West Virginia. Because Dr. McKinney did not respond to a page from Dr. Khan, he did not participate in the decision to transfer Wade.

After assessing Wade's condition, which Dr. Hrebinko called an "abdominal catastrophe", id. at 306:19, Dr. Zaslau, a urologist at Ruby, took Wade into surgery in the early morning of Sunday, October 8, 2014, where he resected the ileal conduit constructed by Dr. McKinney, and attached a new one.  During the operation, Dr. Zaslau also realized that the section of Wade's small bowel from which Dr. McKinney had removed a portion of the ileum was dead. To assist with the excision of the non-viable portion of the bowel, Dr. Zaslau called in Dr. Hazard, a general surgeon, who created an ileostomy that allowed Wade to expel feces externally through a stoma.  Following this surgery, Wade was sent to Ruby's intensive care unit.  Id. at 189:20-21.

Wade remained at Ruby from October 7, 2007, until February 7, 2008, when he was transferred to the Clarksburg VA. Four days

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

later, on February 11, 2008, he was admitted to the Community Living Center (the "CLC") of the Clarksburg VA, where he received rehabilitation and wound care. Ultimately, he remained at the CLC until he died on November 5, 2009. Id. at 404:16. His certificate of death listed "end stage COPD" and "failure to thrive" as the immediate causes of death. (Dkt. No. 47 at 2).

## II. BREACH

### A.   Legal Standard

"While the identification of the applicable standard of care in a medical malpractice action is a question of law, the ultimate determination of whether a party deviated from the standard of care and was therefore negligent is a question of fact." Amy G. Gore, et al., 61 Am. Jur. 2d Physicians, Surgeons, Etc. § 334 (2013).

In West Virginia, in a case alleging medical negligence, the MPLA requires a plaintiff to prove by a preponderance of the evidence that "[t]he health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances." § 55-7B-3(a)(1). The general rule in West Virginia is that a plaintiff must establish the standard of care

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**AND GRANTING JUDGMENT TO PLAINTIFF**

and its breach to a reasonable medical probability through expert testimony. See <u>Goundry v. Wetzel-Saffle</u>, 568 S.E. 2d 5, 8 (W. Va. 2002); <u>see also</u> § 55-7B-7(a).

**B.    Findings of Fact**

At trial, Dawson presented the testimony of Dr. Hrebinko, an expert in urology. (Trial Tr. 256:9-11). Dr. Hrebinko's testimony encompassed the standard of care applicable to Dr. McKinney's decision to perform a cystoprostatectomy with ileal conduit, as well as his post-operative responsibilities to his patient. <u>Id.</u> at 433:21-435:11. Dawson argues that Dr. McKinney breached the applicable standard of care in both instances. <u>Id.</u> Dr. Lyne, the United States' expert, disagreed with Dr. Hrebinko, opining that the cystoprostactectomy with ileal conduit was appropriate under the circumstances.

**1. First Occurrence: The Cystoprostactectomy & Ileal Conduit**

Dr. McKinney assumed responsibility for Wade's care and treatment in February 2006, following a referral from Dr. Mataban, who had been treating Wade for bladder cancer by administering immunotherapy in the form of Bacillus Calmette-Guerin ("BCG"). (Trial Tr. 80:8-18). Although the BCG had cured several obvious areas of Wade's cancer, bladder washings ordered by Dr. McKinney

8

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

still returned positive cytologies, a fact that worried both Wade and Dr. McKinney. Id. at 81:5-9.

The positive cytologies alone, however, did not reveal where the malignant cells were located, whether in the bladder or some other component of the urinary system. Id. at 257:5-260:25. Dr. McKinney therefore performed biopsies of Wade's bladder to determine whether it was the source of the cancerous cells. Those tests were all negative. Id. at 81:23-82:3. At that point, Dr. McKinney did not biopsy the ureters or urethra, other potential sources of the cancer. Id. at 82:4-12. Rather, without first confirming whether Wade's bladder was in fact the source of the positive cytologies, he recommended removing Wade's bladder through a radical cystoprostactectomy. Id. at 82:13-24.

The plaintiff's expert, Dr. Hrebinko, opined that "the absolute indication for cystectomy was lacking," and that positive cytologies alone are "not a reason to take out someone's bladder." Id. at 257:5-15. He testified that, before recommending the cystoprostactectomy, "standard practice" required Dr. McKinney to "sample the prostatic urethra," and perform a "retrograde pyelogram to make sure there's no tumor upstream." Id. at 263:6-264:5. Moreover, without first determining that the bladder is cancerous,

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

Dr. Hrebinko stated that a patient could undergo a needless, complicated surgery to remove a healthy bladder, and still have cancer. Id. at 276:9-18.

Relying on his medical experience, Dr. McKinney determined that Wade's bladder likely was the source of the cancerous cells and needed to be removed. Id. at 10:14-17. Although unknown to Dr. McKinney at the time he operated on Wade, the pathology report following surgery did identify the dome of the bladder as containing urothelial cell carcinoma in situ in the form of a lesion measuring 0.8 x 0.6 centimeters. (J. Ex. 5 at 3827-28.) Given this pathology, Dr. Hrebinko could not opine at trial that recommending and performing a cystoprostactectomy breached the standard of care. (Trial Tr. 330:15-332:18.) He explained that, although the cystoprostactectomy was not the preferable option, "falling below the standard of care would be a little too much to say." Id. at 332:10-18, 327:15-17.

Nevertheless, Dawson contends that Dr. McKinney also breached the applicable standard of care when he constructed an ileal conduit without considering the possibility of a neobladder. A neobladder is a "[s]urgically constructed (usually using stomach or intestine) replacement for urinary bladder." Stedman's Medical

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

Dictionary (28th ed. 2006) [hereinafter Stedman's]. Many urologists find it preferable to the ileal conduit because it allows patients to maintain the ability to urinate naturally, rather than through a stoma and into a collection bag, and the complication rate is lower than with an ileal conduit. (Trial Tr. 282:7-284:21.)

According to Dr. Lyne, however, the neobladder requires more operating time than the ileal conduit, as well as a patient who is willing to catheterize himself. Id. at 416:18-417:12. Moreover, patients like Wade, with a history of carcinoma in situ, are not good candidates for the neobladder. Id. As Dr. Lyne testified: "When you do a neobladder you're actually leaving more tissue behind then [sic] was the case with this surgery [the ileal conduit] and if you have a recurrence where the neobladder is now affixed to the urethra, it's a disaster." Id. Because of this, Dr. Lyne concluded that Wade was not a good candidate for the neobladder. Id. at 417:13-19.

Dr. Hrebinko testified that the "[i]leal conduit is an accepted means of diverting the urine but for a fairly healthy 70 year-old man I would definitely offer him an orthotopic neobladder." (Trial Tr. 278:2-4.) Dr. McKinney disagreed and

11

concluded that, given Wade's age and COPD, as well as the additional time the neobladder would have taken, the ileal conduit was the better alternative.  Id. at 89:21-91:3.  Dr. Lyne agreed with Dr. McKinney's assessment.  Id. at 416:18-417:12.

### 2. Second Occurrence: Post-Operative Care

Dr. Hrebinko also testified that, to meet the standard of care following a cystoprostactectomy, a urologist must visit the patient once or twice a day. (Trial Tr. 300:17-25, 451:8-10.)  Dr. McKinney operated on Wade on October 1, 2007, and testified that he visited Wade "every day" before Wade was transferred to Ruby.  Id. at 136:21-23.

The evidence presented at trial establishes that Dr. McKinney did perform his rounds on October 2 and 3 – the first two post-operative days following Wade's surgery on October 1st.  (Pl.'s Ex. 6 at 5663, 5653.) However, Wade's medical record contains no notes by Dr. McKinney after October 3. (Trial Tr. 108:9-10, 113:3-5, 136:24-137:1, 244:10-12.)  Although the lack of notes is not dispositive of whether Dr. McKinney saw Wade and evaluated his post-operative status on October 3 and thereafter, it raises a significant doubt for a finder of fact as to whether Dr. McKinney actually saw his patient on those days.

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**AND GRANTING JUDGMENT TO PLAINTIFF**

Dr. McKinney conceded that he should have made notes to document his visits, but claims that he did not want to "clutter up" the patient chart. Id. at 113:7-10. Indeed, making notes following rounds is not considered clutter but rather standard practice for attending physicians. Id. 244:13-15 (showing that Dr. Westfall made notes every day), 304:5-12 (explaining that, even if residents make the notes for the doctors, the notes are in the medical records every day). Thus, Dr. McKinney's failure to note his visits to Wade, and to document what he actually observed regarding his patient's clinical condition, significantly undermines his credibility overall, particularly regarding the accuracy of his recollection of Wade's clinical status.[4]

Dr. McKinney's credibility is particularly dubious regarding events that occurred on the third post-operative day, October 4th. Early that morning, at 6:40 a.m., a nurse attending Wade called Dr. McKinney to notify him that his patient's oxygen saturations had dropped. (Pl.'s Ex. 6 at 5647; Trial Tr. 107:14-17.) Dr. McKinney did not answer her call, nor did he call back, even after the nurse

---

[4] As has often been observed regarding the state of the medical record in a professional negligence case, "if it isn't documented, it didn't happen."

left him a voice mail. (Pl.'s Ex. 6 at 5647; Trial Tr. 107:20-108:2.) On direct examination, Dr. McKinney explained that he did not answer the nurse's call at 6:40 a.m. because he rounded between 7:00 and 7:30 a.m. (Trial Tr. 107:24-108:8.) This testimony raises more questions then it answers, however, including why the nurse would have called Dr. McKinney in the first place had she been aware that he regularly rounded at 7:00 a.m., and would be arriving within twenty minutes.  It also raises the question how Dr. McKinney could have failed to document his visit to Wade, and his assessment of Wade's status, after receiving a call from the attending nurse concerning Wade's deteriorating clinical condition.

Dr. Westfall testified that she saw Dr. McKinney at the Clarksburg VA on the fourth post-operative day, October 5th, and that they discussed Wade's condition at that time.  Id. at 237:15-22.  She further testified that she saw Dr. McKinney walk into Wade's room, although she did not know what happened beyond that. Id. at 238:4-5.

Other than Dr. McKinney's undocumented recollection, there is no evidence in the record whatsoever that he saw Wade again prior to Wade's transfer to Ruby on October 7th. On the fifth post-operative day, Saturday, October 6, at 8:13 a.m., when Wade's

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

physical status had deteriorated dramatically, Dr. Khan noted that he would "call Urology today," indicating he had not yet seen Dr. McKinney, who, as the attending urologist, should have rounded between 7:00 and 7:30 a.m.   (Pl.'s Ex. 6 at 5619.) Dr. Khan eventually placed the call to Dr. McKinney at 12:32 p.m., suggesting strongly that he had expected to see, but had not yet seen, Dr. McKinney. Id. at 5620.  He received no response. Id. On Sunday, October 7, at 11:11 a.m., Dr. Khan noted that he had paged Dr. McKinney again, because McKinney had not seen Wade. Id. at 5612. Furthermore, Dr. Santosh Shenoy, the staff surgeon, was called upon to check on Wade because the ICU "cannot contact the urologist." Id. at 5610.

Even assuming that he rounded every day, as Dr. McKinney claims, as the attending physician he was obligated to take appropriate action in response to Wade's worsening condition, including clinical indications that Wade was septic. On the first post-operative day, Tuesday, October 2nd, one of the nurses noted "possible urine tinged drainage from ileoconduit." (Pl.'s Ex. 6 at 5668.) Significantly, the nurses' notes continued to document urine leakage every day until Wade was transferred. Id. at 5656 (October 3), 5647 (October 4), 5631 (October 5), and 5617 (October 6).

15

Significantly, on October 2, Dr. McKinney also confirmed that the "[d]rainage through wound is urine." Id. at 5663.

As Dr. Hrebinko explained, "urine leaking is a big problem" because it enters the abdominal cavity, and "sepsis is bound to happen if you have that ongoing for any period of time." (Trial Tr. 290:19-291:9.) Moreover, "the wound will break down and you'll have a dehiscence of the wound where the muscle fascia that keeps the wound together will break open." Id. at 291:14-16. According to Dr. Hrebinko, the applicable standard of care for urine leakage following a cystoprostactectomy required Dr. McKinney to "take the patient back to the operating room" on post-operative day one to "find out why it's leaking," and "fix it so it won't leak anymore." Id. at 292:9-20.

Additionally, Wade's white blood cell count ("WBC") rose to concerning levels. While Dr. Hrebinko acknowledged that a patient's WBC is often elevated after surgery, he testified that, typically, it does not rise above 15 to 20 thousand. (Trial Tr. 293:24-294:6.) Although not an expert witness, Dr. Zaslau, the attending urologist at WVU who operated on Wade, testified that a patient's WBC should be less than 12,000. (Trial Tr. 149:10-12.) The nurses' notes recorded Wade's WBC as 21.7 on October 2, the

first post-operative day, when they also noted the urine tinged
drainage from the ileoconduit. (Pl.'s Ex. 6 at 5673.) On October 3,
they recorded his WBC as 25.9, and noted that it had taken a
"marked left shift." Id. at 5653-54. Following the administration
of antibiotics by Dr. Westfall, a decision with which Dr. McKinney
disagreed, id. at 231:4-7, on Thursday, October 4, the third post-
operative day, the nurses  recorded Wade's WBC as 15.8, id. at
5639; 17.9 on October 5, the fourth post-operative day, id. at
5625; and 23.0 on October 6, the fifth post-operative day (Dkt. No.
90-1).[5]  Dr. Hrebinko testified that the combination of the
elevated WBC, especially on the first and second post-operative
days, with documented urine leakage, should have prompted Dr.
McKinney to return to the operating room with Wade to correct the
problem.  Id. 295:10-11.

Wade also experienced elevated potassium, or hyperkalemia, and
elevated creatinine levels following his surgery. The medical
records document a potassium level of 7.1 on Tuesday, October 2,
the first post-operative day. (Pl.'s Ex. 6 at 5673).  Dr. McKinney
admitted that this level of potassium was concerning.  (Trial Tr.

---

[5] According to Dr. Zaslau's testimony, Wade had a WBC of 40 prior
to the reconstruction of his ileal conduit at Ruby.  Trial Tr. 149:1-3.

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

96:8-11).  Moreover, Wade's level of creatinine increased from a baseline level of 1.2 to 2.5 on Tuesday, October 2, and to 3.9 on Wednesday, October 3. Id. at 104:7-11. These elevated levels were further clinical indications that urine was leaking into Wade's abdominal cavity.  Id. at 299:23-25.

Dr. Hrebinko explained that Dr. McKinney's knowledge of the urine leakage, together with Wade's worsening clinical presentation, including the elevated WBC with a marked left shift, and elevated potassium and creatinine levels, should have provoked Dr. McKinney to surgically explore Wade's abdomen to determine whether a leak existed.  Id. 300:1-7.

Although Dr. Lyne did not address this issue in his testimony, Dr. McKinney testified that he "did not think that it was from urine leakage causing those tinges so [he] was not that concerned because that can happen." Id. at 111:10-12.  The Court, however, does not credit Dr. McKinney's testimony in this regard in the face of the strong clinical evidence that urine was leaking into his patient's abdominal cavity, and that Wade was displaying increasing symptoms of sepsis, a situation that so alarmed his consulting physicians they transferred Wade to Ruby where he underwent emergency corrective surgery.

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

## C. Conclusions of Law

### 1. First Occurrence: The Cystoprostactectomy & Ileal Conduit

With regard to Dr. McKinney's recommendation that Wade undergo a cystoprostactectomy, Dr. Hrebinko stated that, in light of the pathology report's later determination of the presence of cancer in the dome of the bladder, he could not say that such a recommendation breached the applicable standard of care. However, he and Dr. Lyne expressed contradictory opinions as to whether Dr. McKinney breached the applicable standard of care by routing Wade's urinary tract through an ileal conduit, rather than by constructing a neobladder.

"[W]here there is more than one method of medical treatment accepted and applied by average physicians similarly situated, the physician may take into account the particular circumstances of each case and may exercise his honest and best judgment in selecting a course of treatment for individual patients." Bellomy v. United States, 888 F. Supp. 760, 765-66 (S.D.W. Va. 1995); see also Moats v. United States, No. 3:06CV120, 2008 WL 8872727, *9 (N.D.W. Va., Mar. 19, 2008) (citing Yates v. University of W. Va. Bd. of Trustees, 549 S.E.2d 681 (2001)). Dr. Hrebinko testified that the ileal conduit is an accepted means of medical treatment,

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

although he did not prefer it for Wade. (Trial Tr. 332:14-15).
Furthermore, Dr. McKinney offered a reasonable explanation that, in
his opinion, the ileal conduit was a better alternative than the
neobladder for a patient with Wade's medical history. Id. at
89:21-90:5. The Court therefore concludes that the evidence does
not preponderate that Dr. McKinney breached the applicable standard
of care by recommending the cystoprostactectomy, or by constructing
an ileal conduit instead of a neobladder.

### 2. Second Occurrence: Post-Operative Care

As to the plaintiff's allegation that Dr. McKinney breached
the applicable standard of care regarding Wade's post-operative
care, the evidence preponderates that Dr. McKinney's post-operative
care of Wade did breach the applicable standard of care. Based on
Dr. Hrebinko's undisputed testimony, the Court concludes that the
degree of care, skill and learning required or expected of a
reasonably prudent urologist acting in the same or similar
circumstances as Dr. McKinney is to visit a patient every day after
performing a radical cystoprostactectomy with ileal conduit, until
it becomes clear that any issues and complications are resolved.
See § 55-7B-3(a)(1). The Court finds as a fact that Dr. McKinney
did not round on Wade every day between Monday, October 1st, the

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

date of the initial surgery, and Wade's transfer to Ruby on Sunday, October 7th, and concludes as a matter of law that his failure to do so breached the applicable standard of care for an attending urologist.

Moreover, even assuming that Dr. McKinney did round every day, Dr. Hrebinko's testimony established by a preponderance of the evidence that the degree of care, skill and learning required or expected of a reasonably prudent urologist acting in the same or similar circumstances as Dr. McKinney is to take the patient back to the operating room on post-operative day one or two to fix a suspected urine leak. (Trial Tr. 292:9-20). The Court concludes that, because Dr. McKinney did not intervene to surgically investigate the cause of Wade's urine leakage within the first two post-operative days following Wade's surgery, he breached the applicable standard of care.

Because the Court has found that Dr. McKinney breached the applicable standard of care in the post-operative care he rendered to Wade, but not in recommending that Wade undergo a radical cystoprostactectomy with ileal conduit, it concludes as a matter of law that the United States is liable for one "occurrence" of professional negligence under the MPLA. See § 55-7B-8(b).

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

**III. PROXIMATE CAUSE**

**A.   Legal Standard**

The MPLA requires plaintiffs to prove to a reasonable medical probability that a health care provider breached the applicable standard of care, and that such breach was the proximate cause of the plaintiffs' injury. See § 55-7B-3(a)(2). The West Virginia Supreme Court of Appeals has interpreted "proximate cause" as "'that cause which in actual sequence, unbroken by any independent cause, produced the wrong complained of, without which the wrong would not have occurred.'" Mays v. Chang, 579 S.E.2d 561, 565 (W. Va. 2003) (quoting Syl. Pt. 3, Web v. Sessler, 63 S.E.2d 65 (W. Va. 1950)).

Here, Dawson has claimed that Dr. McKinney's breach of the applicable post-operative standard of care proximately caused the loss of Wade's digestive system and a permanent and substantial physical deformity in the form of scarring and an ostomy bag, both resulting in significant pain, suffering, and distress to Wade. If Dawson can prove that her father suffered either the loss of his digestive system,[6] or a permanent and substantial physical

---

[6] In its June 20, 2013 memorandum opinion on summary judgment, the Court, relying on Stedman's, explained that the digestive system is a bodily organ system within the meaning of the statute, and that it

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

deformity, and that Dr. McKinney's breach proximately caused either of them, she is entitled to recover damages up to the statutory maximum amount provided in § 55-7B-8(b) for her father's resulting non-economic losses. Dawson alleges that these losses include pain, suffering, and mental distress.

**B. Findings of Fact**

Within hours of Wade's transfer to Ruby, Dr. Zaslau resected the defective ileal conduit constructed by Dr. McKinney and reconstructed and connected a new one. (J. Ex. 11 at ANK336.) When he opened Wade's abdomen, Dr. Zaslau also discovered that a part of Wade's bowel was "nonviable," id. at ANK337, (Trial Tr. 158:3-6), and that there was "frank perforation at the ileo-ileal anastomosis with free stool contamination." (J. Ex. 15 at ANK338; (Trial Tr. 156:18-24.) At that point, he called in Dr. Hazard to address and correct these life-threatening bowel complications. (J. Ex. 15 at ANK338; Trial Tr. 155:5-14.)

---

encompasses "the digestive tract from the mouth to the anus with all its associated glands and organs." (Dkt. No. 58). On summary judgment, Dawson argued that Wade had "lost the ability to absorb vitamins taken orally, lost the ability to regulate the recirculation of water within his body and lost the ability to excrete solid waste from his body through his colon." (Dkt. No. 51). The United States, on the other hand, argued that "Wade's intestinal tract continued to function until his death as he was able to ingest nutrients and eliminate waste." (Dkt. No. 47). (Dkt. No. 58).

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

Dr. Hazard testified that, after resecting the necrotic portion of Wade's bowel, she needed to maintain the continuity and integrity of the gastrointestinal tract, from the mouth to the anus, by reconnecting the bowel. Id. at 194:17-18, 195:4-6. However, reconnecting the bowel through anastomosis is not advisable when there is "extensive intra-abdominal contamination" from stool, as well as "inflammation of the intra-abdominal contents." Id. at 195:6-25. Such circumstances create a dilation of the bowel wall, or edema, and a shortening of the mesentery, or blood supply to the bowel. Id. at 195:10-12. This, in turn, creates tension on the two segments of bowel and is likely to result in an intra-abdominal enteric leak. Id. at 195:12-15.

Based on her concerns with anastomosis, Dr. Hazard decided to externalize Wade's GI tract through an ileostomy. Id. at 195:16-18, 185:1-5, 159:4-15. As she explained, "the externalization of the GI tract is your rectum and anus." Id. at 194:15-16. Thus, the purpose of the ileostomy was to remove the "enteric contents to the outside world." Id. at 196:17-20. However, its other purpose was "to provide nutrition through the GI tract." Id. at 194:20-22. To this end, several days after performing the ileostomy, Dr. Hazard returned to the operating room to insert a gastrostomy tube

24

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

("G-tube") through Wade's esophagus and into his stomach. Id. at 193:14-23; (J. Ex. 18 at ANK1072.) This G-tube served a dual function "as a source of nutrition" and "as a draining apparatus" for the stomach. Id. at 196:23-197:2. It was not removed until nearly nine months later, on June 30, 2008, when Wade first was able to resume eating by mouth. Id. at 201:14-17; (J. Ex. 19 at ANK275.) Wade, however, was never able to resume normal bowel function, and continued to excrete feces through the ileostomy and stoma into a plastic bag for the remainder of his life. (J. Ex. 22 at 4009.)

The testimony elicited at trial provides minimal expert guidance as to whether Wade suffered the loss of his digestive system. Neither party called a gastrointerologist to provide expert testimony on this issue. Thus, the Court had the benefit of only Dr. Hrebinko's testimony, who equivocated on how much of the digestive system Wade had lost, finally concluding that it was at least half of the system. The following exchange took place on redirect examination:

> Q. Go ahead and put up the digestive system. And also, although it's not your area of expertise, it is an area that you deal with because they're all adjacent, do you consider the digestive system, with the intestines and the stomach a separate system from the urinary system?

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

A. Yes.

Q. Okay.  And based on what happened here with the --
with the creation of the ileostomy rather than the use of
the colon, would you consider that the loss of the
digestive system?

A. <u>The loss of part of it.  The loss of the ability to
defecate and the loss of the rectum and anus.  In fact,
the whole colon since he had an ileostomy and not a
colostomy</u>.

Q. And a very shortened ileum --

A. Right.

Q. Correct?  <u>Is that enough for this to be considered a
loss of the system</u>?

A. <u>I would think so</u>.

(Trial Tr. 336:4-21.) (Emphasis added).

On recross, however, Dr. Hrebinko walked that opinion back,

and seemed to confirm that Wade had lost the use of only part of

his digestive system:

Q. Thank you.  And with regard to the intestine --
intestine system, I think you said he lost the function
of part of it, is that right?

A. Yes.

Q. But he could still consume nutrients and eliminate
waste, so he did not lose the entire system, did he?

A. No.  <u>He lost the ability to store the stool, but he
still was able to excrete it</u>.

...

26

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

> Q. Would it be fair to say to lose a system -- a bodily
> organ system, you'd have to lose the function of that
> system; the function being in the urinary system to expel
> urine from the body and the function being in the
> intestinal system, to eliminate waste, is that right?
>
> A. <u>Well one of the functions, the other function is at
> least half of that is to be able to store the urine and
> the stool and so that is completely gone.  Those two
> functions would be gone.  But, yeah, the ability to
> excrete those -- urine and stool would still be there</u>.

<u>Id.</u> at 337:23-338:5, 339:19-340:3 (emphasis added).

**C. Conclusions of Law**

Few states tether an increased cap on non-economic damages to the "loss of a bodily organ system," as the West Virginia legislature has done in the MPLA.  <u>See also</u> Ohio Rev. Code Ann. § 2315.18(B)(3)(a).  For this reason, case law applying the phrase is limited.  <u>But see</u> <u>MacDonald v. City Hosp., Inc.</u>, 715 S.E.2d 405 (W. Va. 2011); <u>Williams v. Bausch & Lomb Co.</u>, No. 2:08CV910, 2010 WL 2521753 (S.D. Ohio, June 22, 2010).  Nevertheless, this Court remains unpersuaded by Dr. Hrebinko's testimony that Wade suffered a loss of something more than "part of" his digestive system.  As such, the evidence does not preponderate that Dawson is entitled to the increased amount of damages under that clause of the MPLA.

Under a preceding clause of the same statute, however, Dawson may recover increased damages if Wade suffered a "permanent and

substantial physical deformity." § 55-7B-8(b)(2). Stedman's defines "deformity" as a "permanent structural deviation from the normal shape, size, or alignment, resulting in disfigurement." As one court has noted, whether an injury qualifies as a deformity under the MPLA is a question of fact. See Wilson v. United States, 375 F. Sup. 2d 467, 471 n.5.

Dr. Hazard testified that the purpose of an ileostomy is "to allow for externalization of the GI tract," i.e., "your rectum and anus." Trial Tr. 194:14-16. One need not be a medical doctor to understand that externalizing one's rectum and anus, and moving those organs to the side of one's abdomen, results in a realignment of the digestive tract and a disfigurement to the body. Moreover, this disfigurement was permanent; Dr. Hazard testified that the ileostomy was not reversible due to "a pretty significant increased risk of postoperative complications." Id. at 198:13-199:4. Finally, the ileostomy also resulted in the permanent fixture of a plastic bag attached to the stoma protruding from Wade's abdomen. The bag was often filled with Wade's own feces. Id. at 59:18.

Having determined that Wade suffered a substantial and permanent physical deformity as a consequence of the ileostomy, the Court next must determine whether Dr. McKinney's negligent failure

28

to correct Wade's negligent post-operative care proximately caused

the need for the ileostomy. As Dr. Hazard explained, the ileostomy

was necessary due to "inflammation of the intra-abdominal contents"

(i.e., "contamination of stool"), "dilation of the bowel wall," and

"shortening of the mesentery." Trial Tr. 195:3-25. Dr. Hrebinko's

testimony established to a reasonable medical probability that

these problems were avoidable.

> Q. [A]re you saying there may have been a perforation of
> the bowel during surgery?
>
> A. . . . [W]hen you monkey around with that mesentery you
> have to make absolutely certain at [sic] all those
> intestinal segments still have an appropriate blood
> supply and if they don't, you have to correct it then.
> You can't let the patient go without correcting that
> because you will have dead bowel eventually.
>
> . . .
>
> Q. So then are you saying that had he taken him back, as
> you think he should have anyway, with regard to the ileal
> conduit, the -- the leak -- the urine leakage, he would
> have discovered this?
>
> A. I think so. Especially with the description of the
> stoma being, you know, purple or deep red that -- <u>that
> makes it very likely that the intestinal segment or
> segments were ischemic very early on</u>.[7]

---

[7] Dr. McKinney disagreed with Dr. Hrebinko's testimony that,
following an ileal conduit procedure, the stoma should be pink rather
than purple or dark red, which would indicate an ischemic intestine.
Instead, Dr. McKinney testified that the stoma being dark red is "what
you would expect of a normal stoma six days after surgery." Trial Tr.

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

. . .

Q. Although the ischemic injury with the blood supply occurred during surgery, the longer that bowel goes without appropriate nourishment, the worse the injury?

A. Yes.  When you have a piece of dead intestine that, in and of itself, <u>immediately if it's recognized and replaced causes no harm but as it is allowed to go on further and further that piece of intestine dies and then it can perforate because the integrity of the intestine just falls apart and your start having holes in the intestine and in the anastomosis and stool leakage</u>.

<u>Id.</u> at 311:3-313:8 (emphasis added).

This testimony establishes that, had Dr. McKinney taken Wade back into surgery on the first or second post-operative day, <u>see</u> <u>id.</u> at 292:9-18, he could have reconnected the bowel via reanastomosis without complication.  Instead, the necrotic portion of Wade's bowel deteriorated for at least four additional days causing bowel perforation and stool leakage, which required Dr. Hazard to resect a larger portion of the bowel, thereby shortening the mesentery and precluding reanastomosis.  As Dr. Zaslau explained, "now we have to take new ileum and also had some -- some bowel resection work as well so [Wade] has quite a shortening of

---

115:7-8.  Dr. Zaslau, however, confirmed Dr. Hrebinko's understanding of the stoma color by testifying that a stoma's dark red or purple color "may suggest that there is some ischemia to it."  <u>Id.</u> at 153:20-21.  The evidence preponderates that, at a minimum, Dr. McKinney was required to investigate this clinical development, which he did not do.

his intestine." Id. at 156:5-7. Because reanastomosis of the bowel was not possible on October 8, Dr. Hazard had to perform the ileostomy, which resulted in a permanent ostomy bag.

Based on this evidence, the Court concludes that the preclusion of reanastomosis of the bowel due to a shortened mesentery was reasonably foreseeable given Wade's urine leakage and dark red stoma, as well as his well-documented deteriorating clinical presentation. See Syl. Pt. 3, Hartley v. Cede, 82 S.E.2d 672, 674 (W. Va. 1954) ("To be actionable, negligence must be the proximate cause of the injury complained of and must be such as might have been reasonably expected to produce an injury."). Therefore, the Court concludes as a matter of law that Dr. McKinney's post-operative abandonment proximately caused the need for the ileostomy and thus Wade's substantial deformity.

## IV. DAMAGES

### A.    Legal Standard

Under § 55-7B-8(b), the plaintiff may recover compensatory damages up to $500,000 "where the damages for noneconomic losses suffered by the plaintiff were for . . . permanent and substantial physical deformity." Dawson seeks non-economic losses for Wade's pain, suffering, and emotional distress. Thus, the Court must

assign a monetary value up to the statutory maximum for the pain,

suffering, and distress attributable to Wade's second surgery and

substantial permanent deformity. In so doing, it must distinguish

such losses from those attributable to other sources, such as

Wade's COPD.  At trial, Dawson focused primarily on the pain and

suffering Wade endured at Ruby and the CLC associated with his

ileostomy, and the collection bags, as well as his overall distress

and discomfort and loss of independence.

## B.    Findings of Fact

Dr. Hazard explained in her notes following Wade's surgery on

October 8, 2007, that "[d]ue to the shortening of the mesentery, an

ileostomy was created on the ipsilateral side to the ileal

conduit." J. Ex. 15 at ANK339.  Because both the ileal conduit and

the ileostomy were constructed on the same side of Wade's body, the

stomas were in close proximity, <u>see</u> (J. Ex. 22 at 4459); (Pl.'s Ex.

2), which caused complications with the collection bags.  These

would overlap and stick to each other such that, if one detached,

it would pull off the other. (Trial Tr. 61:6-12, 13:21-22.)

Dawson testified that the nurses at Ruby had devised a way "to

keep appliances on for at least maybe 24 hours." <u>Id.</u> at 55:18-20.

After Wade returned to the Clarksburg VA, and entered the CLC in

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

February, 2008, however, his ostomy bags frequently became detached from his abdomen, which caused feces and urine to leak over his wounds. Id. at 59:13-15; (J. Ex. 22 at 5445) ("Multiple ostomies - continue to be a problem with bags."). Dawson testified that cleaning him up would cause excoriation[8] of the stomas and surrounding skin. (Trial Tr. 59:13-15; Pl.'s Ex. 2; J. Ex. 22 at 4358) ("Pt. abd, sheets, and bed pad covered in stool. . . . Umbilicus is so excoriated it is a burgundy color and bleeding."); (Trial Tr. 363:22-363:2.)  She further testified that,

> [w]hen he had stool and urine on his body like that, he would be in so much pain that he would actually cry out. Just taking wet gauze to wipe it and clean it off caused great deal of pain and at times they would have to give him some medication to try and ease the pain but they weren't able to completely get rid of the pain while they were trying to take care of this.

Id. at 61:23-62:4.  In addition to falling off, the collection bags would sometimes stick to Wade's ostomy wounds, and peeling them off resulted in painful irritation to the ostomy sites.  Id. at 60:17-23; J. Ex. 22 at 4688 ("[C]hronic irritation from osteomy [sic] sites.").

---

[8] "Excoriation" is defined as "a linear break in the skin surface, usually covered with blood or serous crusts." Stedman's.

## MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## AND GRANTING JUDGMENT TO PLAINTIFF

In April, 2009, nearly fourteen (14) months after he became a resident on the CLC, the nurses noted that Wade had begun to change his ostomy bags, and to care for his wounds himself. See (J. Ex. at 4334) ("[P]t refuses to have appliances applied. [U]sing 4x4's and pad over stomas. [U]sing brief to hold in place."); id. at 4327 ("[P]t cont to refuse appliances and is using 4x4's with with [sic] pads and brief."). Dr. Moxley, Wade's attending physician on the CLC, testified that once Wade began "taking care of these things himself," "most of that pain later on, okay, I hate to say it, but a lot of it was self-inflicted," because "when the ostomy bags would leak he wouldn't always immediately call for a nurse." (Trial Tr. 363:20-21; 399:13-18, 358:23-359:5.) Despite Dr. Moxley's testimony, the evidence preponderates that the cleaning of Wade's stomas and ostomy would have caused him pain, regardless of who attended to those needs.

To be sure, Dr. Moxley testified that he and the CLC staff did all they could to mitigate Wade's pain and suffering through medication. Id. at 363:23-364:8. But it is unclear how much their efforts actually helped. As one nurse noted just a month before Wade passed away, "[r]ates pain as a '10' and pain really never improves regardless of meds given." (J. Ex. 22 at 4063.)

34

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

Thus, the evidence preponderates that Wade suffered enormous pain and suffering both during the long months of convalescence at Ruby, and also during the time he resided at the CLC.  In fact, counsel for the United States conceded as much during her opening statement. (Trial Tr. 13:20) ("[Wade] enjoyed his life at the VA; however, he did experience pain."). Moreover, as Dr. Moxley explains, this pain was directly related to Wade's ileostomy. Id. at 406:15-407:3.  While the Court is cognizant of the government's argument that Wade's own actions caused his pain, that argument is disingenuous at best. The vast majority of the pain and suffering Wade endured both at Ruby and at the CLC was proximately caused by the ileostomy that was medically necessary following the negligent post-operative care of Dr. McKinney at the Clarksburg VA.

In addition to Wade's pain and suffering, the parties contested Wade's overall mental status while a patient at the CLC. See King v. Ferguson, 480 S.E.2d 516, 522 (W. Va. 1996) (recognizing "mental anguish" and "mental distress" as types of non-economic losses).  On direct examination, Dr. Moxley described Wade as "happy," "content," and "independent."  (Trial Tr. 364:10, 367:6-7.)  Wade's social worker at the CLC, Ms. Pancake, described him "always smiling," "a pleasant guy," and "a nice -- nice man."

Id. at 211:8-11. Moreover, she testified that, although she tried to arrange Wade's transfer to a nursing home in West Virginia, because they are smoke-free, Wade, a smoker who refused to quit, rejected the transfer.  Id. at 208:12-20, 209:16-18.  Ms. Pancake even contacted nursing homes in Maryland so that Wade could be closer to his daughter, but he refused that transfer as well.  Id. at 209:19-210:1.

The medical records from the CLC paint a different picture of Wade's mental status from that described by Dr. Moxley and Ms. Pancake. After he arrived on the CLC, the speech pathologist noted that Wade "does not see improvement in daily life and voiced concerns if he would ever leave this 'hell hole.'  He was unable to voice much happiness with his life and current status."  J. Ex. 22 at 5280.  On February 17, 2009, Wade told a CLC nurse "I'M SO TIRED OF THIS I COULD JUST SCREAM, WOULD LIKE TO TAKE THIS FULL COLOSTOMY BAG DOWN AND PUT IT ON THAT DR DESK, CAN'T SLEEP ALL NIGHT WITHOUT WAKING UP TO A MESS."  Id. at 4464 (emphasis in original). Dr. Moxley diagnosed Wade with anxiety that could only be controlled with Ativan, and Wade mentioned suicide on one occasion, although he later recanted.  Id. at 4459, 4358. Finally, Wade's occupational therapist noted that Wade had "recent episodes of depression and

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

[was] becoming tearful." Id. at 5302. Thus, despite testimony recalling Wade's happy attitude, the records convincingly document that he actually suffered a great deal of mental anguish and frustration over his situation due to chronic problems with his ostomy bags and the attendant discomfort and inconveniences.

The Court recognizes, however, that not all of Wade's distress was directly related to problems with his ostomy bag. That he suffered from COPD, with attendant hypoxia and cachexia exacerbated by the smoking habit he refused to give up, is clearly documented. (Trial Tr. 361:19-21, 354:6, 353:25; J. Ex. 22 at 4788). Dr. Moxley testified that Wade's COPD was so bad that "he was actually losing not only his reserve lung function, he was losing a lot of the lung function that he actually needed to survive." (Trial Tr. 353:12-15.) Because of this, Wade required an oxygen machine until the CLC staff was able to get his breathing under control. Id. at 353:18-354:3.

Certainly, the effects of Wade's chronic pulmonary diseases contributed to his overall discomfort. Nevertheless, in this Court's opinion, as the finder of fact, it is a bridge too far to blame all – or even most – of Wade's physical and psychological discomfort on his COPD. The evidence preponderates that, following

37

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

his surgery at the Clarksburg VA, Wade suffered great physical distress and mental anguish as he struggled to live with the consequences of Dr. McKinney's professional negligence.

Finally, Dawson urges the Court to increase her damages based on her father's loss of independence. She testified that, prior to his surgeries, Wade shopped for groceries, prepared his own meals, cut his grass, enjoyed recreational activities, and provided assistance to others. Id. at 32-33. She argues that "[a]fter the October 1, 2007 surgery, Mr. Wade was not able to return to his home or to otherwise live independently as he had prior to the surgery." (Dkt. No. 84 at 33).

The Court is not persuaded by this argument. Dawson never acknowledges how much of Wade's inability to ambulate was attributable to his COPD. Nor did she present evidence at trial establishing whether, given his COPD, her father could have returned to his former life following his cystoprostactectomy with ileal conduit. Thus, the Court is unable to find by a preponderance of the evidence that, but for the ileostomy, Wade would have spent the remainder of his life living independently.

It is also notable that when the CLC offered to transfer Wade to nursing homes where he could have been more independent, Wade

38

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

refused to leave since he wanted to smoke. Moreover, the CLC did all that it could to improve Wade's independence by placing him in a private room, providing him with a scooter, allowing him to come and go as he pleased, and permitting him to smoke.

Nevertheless, despite Wade's COPD and related illnesses, the evidence preponderates that Wade suffered significant non-economic losses that were proximately caused by the medical negligence of Dr. McKinney. These losses included long-term pain, suffering, and mental distress related to his ileostomy, both during his convalescing months at Ruby and during his life at the CLC.

## C. Conclusions of Law

The losses attributable to Dr. McKinney's professional negligence are significant and warrant an award of damages in excess of the statutory maximum amount. Although § 55-7B-8(b) caps damages at $500,000, subsection (c) provides for the adjustment of inflation based on the United States Department of Labor's consumer price index, with adjustments beginning January 1, 2004, and continuing annually thereafter. Based on this calculation, the Court concludes as a matter of law that Dawson, in her individual

capacity and as executrix of Wade's estate, is entitled to recover $635,641.30 in non-economic damages.[9]

### V. FINAL JUDGMENT

Dawson has proven by a preponderance of the evidence the elements of medical professional liability set forth at West Virginia Code § 55-7B-3. Not only did she demonstrate to a reasonable medical probability that the United States, through Dr. McKinney's professional negligence, breached the standard of care applicable to the post-operative care he provided to Wade, but she also established by a preponderance of the evidence that, to a reasonable probability, Dr. McKinney's breach proximately caused Wade to suffer a permanent and substantial physical deformity, which proximately caused a substantial amount of Wade's pain, suffering, and distress. Under the MPLA, therefore, Dawson is entitled to recover the statutory maximum amount of monetary damages for non-economic loss, in the amount of $635,641.30.

The Court therefore **CONCLUDES** that the United States is liable to Linda Lou Dawson, individually and in her capacity as executrix

---

[9] This calculation was performed on March 31, 2014 using the U.S. Department of Labor's "CPI Inflation Calculator," found at http://www.bls.gov/data/inflation_calculator.htm.

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND GRANTING JUDGMENT TO PLAINTIFF**

of Wade's estate, for a total judgment in the amount of **$635,641.30.**

It is so **ORDERED.**

The Court directs the Clerk to enter a separate judgment order in favor of the plaintiff against the defendant in the amount of $635,641.30, to dismiss the case with prejudice, and to transmit copies of these Findings of Fact and Conclusions of Law to counsel of record.

DATED: March 31, 2014.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE